IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DENVER JAMES WHITE,

   Plaintiff,

  v.            No. CV 08-0955 WJ/GBW

DONA ANA COUNTY DETENTION CENTER, ET AL.

   Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

  THIS MATTER is before the Court on Defendants' *Martinez* Report filed April 12, 2010 (*docs. 83, 84*), which Defendants requested that the Court construe as a motion for summary judgment.  Plaintiff Denver James White filed his response on May 13, 2010, opposing Defendants' motion for summary judgment and requesting the Court grant Plaintiff summary judgment.  *Doc. 95.*  Defendants did not to reply.  On October 26, 2010, I held an evidentiary hearing.  *Doc. 126.*

  I have construed the *Martinez* Report as a motion for summary judgment in this Report and Recommendation. I also put Defendants on notice that I intended to consider the request for summary judgment contained in Plaintiff's response to the *Martinez* Report as a motion for summary judgment on November 19, 2010.  *Doc. 129.*  That notice gave Defendants an extra 28 days to  respond if there was any further evidence they wanted the

Court to consider before issuing this Report and Recommendation on the competing motions for summary judgment. *Id.* Defendants chose not to respond. On December 16, 2010, however, all "County" Defendants filed an unopposed Motion to Dismiss because they had reached a settlement agreement with Mr. White. *Doc. 132.* That motion was granted on the same day, leaving only Aramark employee Defendants Mary Trujillo and Alejandra Ramirez in the case. *Doc. 134.*

This case was assigned to me on May 21, 2009, (*doc. 34*) and Judge Johnson referred the case to me on July 1, 2010 to submit proposed findings of fact and recommendation for the disposition of the case pursuant to 28 U.S.C. §636(b)(1). *Doc. 106.* Having considered the pleadings, relevant law, and the additional evidence offered at the October 26, 2010 Evidentiary Hearing (*see doc. 126*), I recommend partial summary judgment be granted in favor of Defendants and partial summary judgment be entered in favor of Plaintiff. If my recommendations are adopted, I will hold a separate hearing regarding damages.

## BACKGROUND

Plaintiff claims that several of his constitutional rights were violated during his stay at the Dona Ana County Detention Center (DACDC) as a pre-trial detainee.[1] These alleged violations all stemmed from DACDC's mailroom policies and lack of a legal library.

---

[1]Plaintiff is now an inmate at Lea County Correctional Facility in Hobbs, New Mexico.

Plaintiff claims that his first amendment right to free speech, fifth amendment right to due process, fourteenth amendment "right of the equal in the process," and sixth and fourteenth amendment right to access the courts were violated.[2]  *Doc. 1* at 3-4.  He seeks injunctive relief and monetary damages.  Specifically, he requests that the Court order DACDC to maintain a law library for use by its inmates, "fix[]" their mailroom policies, and demote or fire mailroom staff Defendants.  *Doc. 1* at 5.  He also seeks $20,000 in compensatory damages and $20,000 in punitive damages "from each defendant."  *Doc. 1* at 5.5.

When Plaintiff's Complaint was filed on October 15, 2008, he claimed to have been incarcerated at DACDC "for over 11 months."  *Doc. 1* at 2.  During that time, numerous letters and media items that had been mailed to Plaintiff were thrown away or returned to sender for noncompliance with mailroom policies.  One letter was refused for having perfume on it.  *Doc. 1* at 3, *Doc. 84* at 1.  Another letter was rejected for containing ink jet photographs.  *Doc. 1* at 3, *Doc. 84* at 4.  Plaintiff was denied his subscription to the *Christian Science Monitor* because DACDC prohibits newspapers.  *Doc. 1* at 3.5; *Doc. 84* at 5-8, 31-33, 36-38, 41, 43, 45-47.  He was also denied several "Under Lock and Key" newsletters because

---

[2]Plaintiff also states: "They have violated my 1st, 4th, 5th, 6th, 8th, and 14th amendment rights."  *Doc. 1* at 2.  Because Plaintiff never further elaborates on his claims of a fourth, fifth or eighth amendment violation, I find that he has failed to state a claim as to those alleged violations, and I will not speculate as to what additional cause of action he might have intended in this shotgun allegation.

mailroom policies disallowed newsletters and any mailed item that contained "copies." *Doc. 1* at 3.5; *Doc. 84* at 3, 34, 39, 44, 48-51.  Plaintiff was denied a book entitled "The Jailhouse Lawyer's Handbook" because inmates were not allowed to receive books in the mail.  *Doc. 1* at 3.5, *Doc. 84* at 2.

The *Martinez* Report includes 59 Mail Rejection Notices that corroborate Plaintiff's allegations and demonstrate that on at least 17 occasions, Plaintiff was denied mail, at least in part, because it included "copies," and on at least 41 occasions, Plaintiff was denied one or more magazines, newsletters, or newspapers.  *Doc. 84.*  Plaintiff claims the mailroom policies are arbitrary, unrelated to security concerns, and lacking in procedural safeguards. *Doc. 1* at 3.5.

Plaintiff also complains that he was denied photographs once because he was classified as being in the "hole" when he, in fact, was not in the hole.  *Doc. 1* at 3.5; *Doc. 84* at 28, 30.  He also claims that, when an inmate is placed in the "hole," he is not allowed to have access to paper, pens, or any of his legal materials.  *Doc. 1* at 4.2.  Plaintiff also claims that his legal mail was opened by mailroom staff outside of his presence, *Doc. 1* at 4.1-4.2, and that his requests to access a legal library to research law on conditions of confinement were denied. *Doc. 1* at 4.

Plaintiff originally brought his suit against the Dona Ana County Detention Center, Aramark Management Services, L.P., Captain Vicki Garcia, Lieutenant Justin Porter, FNU

Holguin, Mary Trujillo, Alejandra Ramirez.  *Doc. 1*.  Warden Chris Barela and Dona Ana

County Board of Commissioners were later added.  *Doc. 22, 129*.   As of the filing of this

Report and Recommendation, all Defendants have been released either by agreement or

order except Aramark employees Mary Trujillo (Mail Room Lead at DACDC) and

Alejandra Ramirez (Mail Clerk at DACDC).  *See doc. 22, 129, 131, 132, 133*.[3]  Finally, before

Defendant Barela was voluntarily dismissed from this suit, he filed a Motion to Dismiss or

for Summary Judgment.  *Doc. 61*.  That motion and its subsequent briefing, though now

moot, were referred to extensively at the evidentiary hearing and have been relied on at

points in this Report and Recommendation for record support.

Defendants largely do not dispute the specific factual allegations made by the

Plaintiff.  Instead, they disagree with his legal conclusions.  Specifically, they argue that

their mail rejection policies are not unconstitutional because they are related to a legitimate

penological purpose.   *Doc. 83* at 7-11.  They also argue that their mail policies did not

interfere with Plaintiff's exercise of religion, *Doc. 79* at 5, and that none of the rejected or

read mail at issue was "legal mail," and so there was no impropriety in opening it outside

of Plaintiff's presence.  *Doc. 83*. at 8-9.  Defendants do not address Plaintiff's complaints

---

[3]Among other people and entities, Plaintiff has also sought to add as a Defendant "Chaplin" Beam.  *Doc. 109*.  I recommended denying his motion to amend to add Chaplin Beam (*doc. 131*) and Plaintiff has objected (*doc. 135*).  That issue is currently pending before the presiding judge.

about mail procedures for those in the "hole."  Finally, although Defendants Trujillo and Ramirez did not address Plaintiffs' legal access arguments, Defendant Barela argued that the lack of a legal library coupled with the rejection of mailed legal resources did not deny Plaintiff access to the Courts because inmates had access to a public library.  *Doc. 79* at 5.

## STANDARD OF REVIEW

I.    *Consideration of a Martinez Report*

In the *Martinez* Report (*docs. 83, 84*), Defendants seek dismissal of Mr. White's claims on summary judgment.  In the initial order directing submission of a *Martinez* Report (*Doc. 76*), the parties were also advised, pursuant to *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991), that their submissions could be used in deciding whether to grant summary judgment.  Additionally, Mr. White, who is proceeding *pro se*, was afforded (and took) the opportunity to respond to the  *Martinez* Report and to present conflicting evidence to controvert the facts set forth therein.

In his response to the *Martinez* Report, Plaintiff noted that he "respectfully requests that the Court grant Summary Judgment for the Plaintiff as there are genuine issues for trial and an extreme factual basis set forth in this document, and any other relief the court deems fit." *Doc. 95.*  The first part of Plaintiff's request sounds like a request that summary judgement be granted in Plaintiff's favor; however, the second part of the sentence sounds like a request that the Court merely deny Defendants' Motion for Summary Judgment.  As

the Court construes *pro se* Plaintiffs' court filings liberally, I found that Plaintiff's request was for summary judgment in his favor. *Doc. 129*. Nonetheless, I issued an order putting Defendants on notice that I was so construing Plaintiff's request and granting them an extra 28 days to present any further evidence. *Id*.

II.     *Summary Judgment*

Summary judgment is proper if the movant demonstrates that there is "no genuine issue as to any material fact" and that he is "entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). Only disputes over facts that might affect the outcome of the suit under the applicable law will preclude summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"A *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall*, 935 F.2d at 1110. Nonetheless, the non-moving party must "identify specific facts that show the existence of a genuine issue of material fact," *Munoz v. St. Mary-Corwin Hospital*, 221 F.3d 1160,1164 (10th Cir. 2000), and conclusory allegations are insufficient to establish an issue of fact that would defeat the motion. *Hall*, 935 F.2d at 1110. Additionally, in a summary judgment posture, the verified Complaint and the *Martinez* Report may be treated as affidavits. *Id.* at 1111.

Although all facts are construed in favor of the nonmoving party, it is still Plaintiff's responsibility to "'go beyond the pleadings' and 'designate specific facts' so as to 'make a

showing sufficient to establish the existence of an element essential to [his] case' in order to survive summary judgment." *Johnson*, 422 F.3d at 1187 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

*1. Mailroom Policies*

"[P]risoners' First Amendment right to receive uncensored correspondence, 'even though qualified of necessity by the circumstance of imprisonment,' is a liberty interest 'protected from arbitrary governmental invasion.'" *Barrett v. Orman*, 2010 WL 1499586, at *2 (10th Cir. 2010)(quoting *Procunier v. Martinez*, 416 U.S. 396, 418 (1974)). "Resolution of the inmates' claims requires balancing between the constitutional rights retained by inmates and those who send them publications against the deference owed to prison authorities when it comes to prison administration." *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004)(internal citation omitted). Further,

> [t]he Court has determined that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S.Ct. 2254. The four-factor test supplied by the Court requires a look at (1) whether a valid and rational connection exists between the regulation and the asserted legitimate governmental interest, (2) whether alternative means of exercising the constitutional right remain available to inmates, (3) any effect accommodating the right would have on guards and inmates, and (4) the absence of ready alternatives.

*Jacklovich*, 392 F.3d at 426 (quoting *Turner v. Safely*, 482 U.S. 78, 89-90 (1987)). The *Turner*

analysis is the appropriate standard whether the alleged violations occurred in a county jail or a prison.  *See Jones v. Salt Lake County*, 503 F.3d 1147, 1153 (10th Cir. 2007).

"[T]he first *Turner* factor is actually more of an 'element' than a factor in the sense that it 'is not simply a consideration to be weighed but rather an essential requirement.'" *Boles v. Neet*, 486 F.3d 1177, 1181 (10th Cir. 2007)(citing *Salahuddin v. Goord*, 467 F.3d 263, 274 (2nd Cir. 2006).  Although the burden is on the Plaintiff to disprove the validity of a prison regulation, "[t]o satisfy the first *Turner* factor, 'the prison administration is required to make a minimal showing that a rational relationship exists between its policy and stated goals.'" *Boles v. Neet*, 486 F.3d 1177, 1181 (10th Cir. 2007)(quoting *Beerheide v. Suthers*, 286 F.3d 1179, 1186 (2002)).

Once Defendants have met the first prong, however, *Jones* sets a high standard for prisoners seeking to establish that the *Turner* test leans in their favor.  It requires Plaintiffs to state, argue for, and provide evidence that alternatives exist that accommodate inmates' rights while not overburdening the prison.  A review of the analysis in *Jones* demonstrates the Plaintiff's significant burden in such cases:

> It appears Jones has not met his burden under *Turner* to establish the jail's catalog ban is unconstitutional. *See Wirsching v. Colorado*, 360 F.3d 1191, 1200 (10th Cir. 2004) (noting that the burden is not on the state to prove the validity of a prison regulation, but rather on the prisoner to disprove it). "Space, health and safety" are legitimate and neutral penological interests and the catalog ban is rationally related to those interests-these factors weigh in favor of the constitutionality of the ban. Jones makes no mention of either the second or third *Turner* factors-whether there is an alternative

means of exercising his right to receive printed materials and the impact of accommodating the right on guards, other inmates, and jail resources. Regarding the fourth *Turner* factor, Jones does mention a few alternatives to a total ban, but nowhere does he provide evidence that these alternatives come with only *de minimus* costs to the interests of jail administrators and guards. For example, Jones mentions that one alternative would be to permit an inmate to possess only one catalog at a time and a screening process could be used to enforce the rule. But Jones fails to argue -let alone provide evidence- that such a screening process would not unduly burden jail resources. Similarly, Jones suggests the jail could allow inmates to seek permission to obtain a catalog. Again, however, this would require officials to consider such requests on a case-by-case basis and Jones does not offer any evidence or argument that such a process might be implemented with only *de minimus* costs.

*Jones v. Salt Lake County*, 503 F.3d 1147, 1159 -1160 (10th Cir. 2007)(emphasis added).  With these legal standards in mind, I will review the disputed policies.  Plaintiff disputes the legitimacy of several of DACDC's mailroom regulations and practices.  I will address them by category.

### A.  Newspapers and Magazines

The *Martinez* Report shows that Plaintiff received five Mail Rejection Notices for groups of 1-4 magazines that were discarded on the basis that they were magazines and lacked a return address.  *See doc. 84* at 24-27, and 29.  Plaintiff also received 32 Mail Rejections Notices for groups of 1-5 newspapers that were discarded on the basis that they were newspapers and lacked a return address.[4]  *See id.* at 5-18, 20-23, 31-33, 35-38,

---

[4] In another section I will also address Plaintiff's claim that certain newspaper items constitute religious material and their rejection interferes with his right to practice his religion.

40-43, 45-47.

The prison has written regulations that explain these rejections.  DACDC's Operations Manual states, "For security reasons, the Detention Center does not allow for publications, magazines, or books to be mailed into the facility."  *Doc. 83* at Exh. F.  The Operation Manual also states that mail received "without the sender's full name a return address will be returned to sender."[5]  *Id.*  It goes on to explain, "Newspapers and copies thereof are prohibited due to a fire hazard and media coverage of detainees in custody who may be harmed due to the nature of the offense."  *Id.*  Also, in the *Martinez* Report, Defendants further claim that DACDC does "not allow publications, magazines, or books to be mailed to the facility, in part, because of the small amount of space available for inmates to store this material. . . ."  *Doc. 83* at 11.  Additionally, in Defendant Barela's Reply to Plaintiff's Opposition to the Motion to Dismiss, Mr. Barela asserts another justification: "[i]n addition, the policy is a reasonable restriction based upon the number of inmates housed at the Dona Ana County Detention Center and the amount of mail received by the facility."  *Doc. 79* at 3.  Finally, at the October 26, 2010 hearing, Defendant Barela testified that newspapers and magazines are prohibited due to concern that prisoners would use those publications to construct batons and body armor that could

---

[5]The Operations Manual excerpt given in the *Martinez* Report is dated February 12, 2010, and therefore post-dates the alleged violations.  A copy of the manual, as it existed on September 3, 2008, however, is attached to Defendant Barela's Motion to Dismiss (*doc. 61*), and it contains substantially the same language as the later manual.

not be penetrated by the guards' stun guns.  *See doc. 126.*

"Prisons have great latitude in limiting the reading material of prisoners."  *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009)(citing *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989)).  The Tenth Circuit has held that a ban on all catalogues is rationally related to the legitimate and neutral penological interests of "space, health, and safety."  *See Jones*, 503 F.3d at 1160.  Also, a District Court within the Tenth Circuit has held valid a ban on all subscriptions for pretrial detainees due to the detainee's short stay, access to periodicals through the jail's library, and "the penological interests of safety, security, and management of the Jail."  *Prison Legal News v. Cheshire*, 65 Fed. R. Serv. 3d 418, 5-6 (D. Utah 2006).  On the other hand, the Tenth Circuit has held that pretrial detainees have the right to access newspapers. *Thomas v. Leslie,* 1999 WL 281416 (10th Cir. 1999)(holding that prisoners have a right to read newspapers and the detention center's interest in preventing fires was not rationally related to its blanket prohibition of newspapers*); Berger v. White*, 12 F. App'x 768, 771 (10th Cir. 2001)(remanding a case dismissed under 12(b)(6) where Plaintiff asserted his subscriptions to *Newsweek* and *Rocky Mountain News* were denied and the parties disagreed as to whether Plaintiff had access to communal copies of those publications).

Although courts afford prisons some degree of deference when addressing the first prong of the *Turner* analysis, "[t]he logical connection between the regulation and its

asserted goal(s) cannot be so remote as to render the regulation arbitrary or irrational." *Jones*, 503 F. 3d at 1153.  In total, Defendants have asserted no fewer than five penological interests to justify DACDC's ban on newspapers and magazines: (1) fire hazard, (2) prisoner safety due to information learned by inmates about one another, (3) storage constraints, (4) overwhelming amount of mail received by DACDC, and (5) prisoner and guard safety due to prisoner's ability to make batons and body armor from the newspapers and magazines.  *See supra.*

In *Thomas*, the Court held that the penological interest in preventing fires was not rationally related to banning newspapers from prisons.  1999 WL 281416, *7.  The Court reasoned that the fire hazard "could as well be caused by the permitted reading materials."  *Id.*  As in *Thomas*, DACDC permits other reading materials which could create a fire hazard.  Therefore, this Court must reject the fire hazard rationale for prohibiting newspapers.

This Court also rejects the prisoner safety interest as rationally related to a newspaper ban.  True, newspapers include information about arrests and criminal investigations.  And, if prisoners read these accounts, it could lead to violence due to gang-affiliations or disgust at particular types of crimes.  However, banning newspapers does not appreciably reduce these concerns because prisoners have so many other potential sources of information about their fellow inmates.

The remaining penological interests, however, are rationally related to the

prohibition of newspapers. As seen in *Jones*, space and volume issues can be a rational reason to ban a category of items which tend to be large. The Court is particularly persuaded by the explanation behind the penological interest of preventing the creation of weapons and armor from newspapers. The evidence presented by Defendants demonstrates that newspaper are uniquely suited to becoming weapons and body armor.

The rest of the *Turner* factors, however, favor the Plaintiff. As suggested in the *Martinez* Report and confirmed at the hearing, there was no alternative means for Plaintiff to receive newspapers or periodicals. The extent of the library available to detainees was a push-cart that came through from time to time with no newspapers or magazines. *See doc. 126*. The lack of any alternative access is particularly egregious when it comes to access to newspapers and magazines which are the penultimate sources for news and information. The second factor, thus, cuts in favor of Plaintiff.

The third and fourth factors also weigh in favor Plaintiff. Mr. White proposed several options that would allow DACDC to control the amount of newspaper in circulation while giving inmates access to papers and magazines. *Doc. 126.* He proffered a system whereby detainees could have a one-for-one or two-for-two check out system with newspapers and magazines. *Id*. Alternatively, DACDC could offer supervised periodical reading times in day rooms. These proposals would address the legitimate penological concerns expressed by Defendants. Although both options entail some extra costs and burdens on the detention center, the right involved is an important one and it

merits the relatively low costs.

Thus, I find that *Turner* dictates rejecting the blanket prohibition on magazines and newspapers, and I recommend granting summary judgment in favor of Plaintiff and denying it for Defendants on DACDC's blanket prohibition on newspapers and magazines. Defendants Trujillo and Ramirez are both proper defendants for this claim as they each denied several of Plaintiff's incoming newspapers. *Doc. 84* at 5-18, 20-23, 31-33, 35-38, 40-43, 45-47.

B. Books

The *Martinez* Report shows that Plaintiff received one Mail Rejection Notice for a book that was returned to sender.[6] *Doc.* 84 at 2. The prison has a written regulation that explains the rejection. DACDC's Operations Manual states, "For security reasons, the Detention Center does not allow for publications, magazines, or books to be mailed into the facility." *Doc. 83* at Exh. F. Also, in the *Martinez* Report, Defendants further claim that DACDC does "not allow publications, magazines, or books to be mailed to the facility, in part, because of the small amount of space available for inmates to store this material. . . ." *Doc. 83* at 11. Additionally, in Defendant Barela's Reply to Plaintiff's Opposition to the Motion to Dismiss, Mr. Barela asserts another justification: "[i]n addition, the policy is a reasonable restriction based upon the number of inmates housed at the Dona Ana County

---

[6] In another section I will address Plaintiff's claim that the book constitutes legal mail and its rejection interferes with his access to the courts.

Detention Center and the amount of mail received by the facility." *Doc. 79* at 3. Finally, at the October 26, 2010 hearing, Mr. Barela testified that drugs and shanks can be hidden in books and then smuggled into the facility. *Doc. 126.* Mr. Barela also explained that permitting books in inmate cells allows another place where contraband can be hidden. *Id.*

I find that Defendants' space and contraband hiding/smuggling concerns sufficiently related to the ban to hold the first factor in favor of the Defendants. The balance of the remaining factors, however, sides in favor of Plaintiff. The parties contest the frequency of inmate access to the push-cart library; Defendants assert that the cart made it to each inmate once a week, while Plaintiff testified it was more like once a month. *Doc. 126.* Regardless, both agree the number of books available was small (maybe 1,000) and the selection thin. *Id.* The book Plaintiff sought by mail was not available through via the push-cart. *Id.* In any event, it is clear to the Court that the push-cart library is not a meaningful alternative for obtaining books of one's own choosing. Therefore, the second factor weighs in favor of Plaintiff. With respect to the third and fourth factors, the Plaintiff presented the ready alternative of allowing books only if mailed directly from publishers as opposed to from individuals or retailers. Books mailed directly from publishers that have never had the opportunity to be tampered with by a third party do not pose a

smuggling risk,[7] and allowing them in will not significantly burden the detention center. The quantity of the incoming mail is not likely to increase substantially from its current level with this change in policy, and when guards shake down cells and check library books for contraband, they can check the mailed books from publishers at the same time. Moreover, DACDC already has storage restrictions that are unchallenged in this litigation. Thus, requiring DACDC to *accept* books mailed from publishers is not the same thing as requiring DACDC to allow its detainees to amass their own personal library. Thus, I find Plaintiff has presented a valid alternative that preserves an important right yet "would not unduly burden jail resources." *Jones*, 503 F.3d at 1160.

Therefore, I find that *Turner* dictates rejecting the prohibition on mailed books, and I recommend granting summary judgment in favor of Plaintiff and denying it for Defendants on DACDC's blanket prohibition on mailed books. Defendant Trujillo is a proper defendant for this claim as she was the initial mailroom staffer to deny Plaintiff's incoming book. *Doc. 84* at 2.

---

[7] Mr. Barela testified that even books direct from publishers pose a smuggling risk. However, he was unable to explain the mechanism of such risk. To the extent that such a hypothetical risk exists, the Court finds it to be extraordinarily small.

C.  Newsletters

The *Martinez* Report shows that Plaintiff received four Mail Rejection Notices for mail returned to sender on the basis that the mail contained newsletter copies.[8]  *Doc. 84* at 34, 44, 48 and 51.

The prison has written regulations that may explain these rejections.  DACDC's Operations Manual states, "For security reasons, the Detention Center does not allow for publications, magazines, or books to be mailed into the facility."  *Doc. 83* at Exh. F.  Also, in the *Martinez* Report, Defendants further claim that DACDC does "not allow publications, magazines, or books to be mailed to the facility, in part, because of the small amount of space available for inmates to store this material. . . ."  *Doc. 83* at 11. Additionally, in Defendant Barela's Reply to Plaintiff's Opposition to the Motion to Dismiss, Mr. Barela asserts another justification: "[i]n addition, the policy is a reasonable restriction based upon the number of inmates housed at the Dona Ana County Detention Center and the amount of mail received by the facility."  *Doc. 79* at 3.  Finally, at the hearing, Mr. Barela explained that newsletters are prohibited by DACDC policies under the "pretense of the a, a clutter and [incomprehensible] information and that type of stuff." See *doc. 126*, FTR recording at 12:04 p.m.  He went on to add, "there are some standards

---

[8] I will address the rejection of mail based on its inclusion of "copies" in a later section.  In another section I will also address Plaintiff's claim that the newletters constitute legal mail and their rejection interferes with his access to the courts.  Here, the rejection of newsletters is analyzed based upon DACDC's prohibition of "publications."

we, we obviously need to adjust and we will make those adjustments as necessary." *Id.*

DACDC's prohibition of newsletters is neutral since it applies to all newsletters and inmates alike. Unlike the prohibition on newspapers and books, however, I see no rational relationship between an asserted penological interest and the blanket prohibition on newsletters. As explained by Defendant Barela at the hearing, baton and body armor making are not a serious concern with regular 8x10 paper like it is with magazines and newspapers, *doc. 126*, and the concerns of hiding or smuggling contraband with small pamphlets or loose leaf paper are not as severe as with bound publications such as books or magazines. Again, the prison's space and clutter policies are not at issue here, and they may be a valid way to address DACDC's concerns about hiding contraband in cells; but, certainly, banning newsletters "under the pretense of clutter" does not meet the standard set out in *Turner*.

To the extent Defendants seek to reject newsletters based on the number of inmates at DACDC and the amount of mail they are sent, the Court reminds Defendants that "[i]nmates have a First Amendment right to receive information while in prison to the extent the right is not inconsistent with prisoner status or the legitimate penological objectives of the prison." *Jacklovich*, 392 F.3d at 426(quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). Although the Court is sympathetic to the logistical acrobatics that must be performed to provide supervised mail access to hundreds of inmates, a justification for denying mail based on the amount of mail that must be processed could be used for a

blanket prohibition on all incoming items.  Clearly, that has not been the intent of the courts, and it will not stand in the case at bar.  *See e.g. Morrison v. Hall*, 261 F.3d 896, 903-04 (9th Cir. 2001)("As counsel stated at oral argument, 'it's a volume consideration.' But prohibiting inmates from receiving mail based on the postage rate at which the mail was sent is an arbitrary means of achieving the goal of volume control.").[9]

Because the first "factor" is essentially an element, my analysis could end here. *See Boles,* 486 F.3d at 1181.  To be thorough, however, I will provide a full *Turner* analysis. There are no other means by which Plaintiff was able to receive the newsletters he sought by mail. *Doc. 126.*  Plaintiff proposes that DACDC permit in newsletters and search them just like any other mailed item for contraband.  This ready alternative would cause a minimal, if any, increase in DACDC costs.  The infrastructure for mail sorting and searching is already in place, and nothing from the *Martinez* Report or the October 26, 2010 hearing suggests that allowing newsletters into the prison would inundate the mailroom.

Thus, I find that *Turner* dictates rejecting the prohibition on newletters, and I recommend granting summary judgment in favor of Plaintiff and denying it for Defendants on DACDC's prohibition on newsletters.  Defendant Trujillo is a proper

---

[9]Although a District Court within the Tenth Circuit has held valid a ban on all subscriptions for pretrial detainees due, in part, to the detainee's short stay, one important distinction is that the periodicals sought by subscription were available through the jail's library.  See *Prison Legal News v. Cheshire*, 65 Fed. R. Serv. 3d 418, 5-6 (D. Utah 2006).  That was not the case here.

defendant for this claim as she was the mailroom staffer who denied Plaintiff's newsletters.  *Docs. 84* at 34, 44, 48 and 51.

D.  No Return Address

Plaintiff also claims that DACDC violated his rights when it rejected a letter to him from an English professor on the ground that the letter lacked a return address on the envelope (though it did contain a return address on the letter itself).  *Doc. 73* at 3.  As an initial matter, this Court notes that it is not required to address this claim because Plaintiff failed to include it in his Complaint.  Nonetheless, I will address the claim because I find that it relates to Plaintiff's general complaint about DACDC's arbitrary mailroom policies.  *See Hayes v. Whitman*, 264 F.3d 1017, 1025 (10th Cir. 2001)("it might be appropriate for a court to consider additional facts or legal theories asserted in a response brief to a motion to dismiss if they were consistent with the facts and theories advanced in the complaint.").  Additionally, Defendants had the opportunity to respond to the allegation in their motion work for the *Martinez* Report, the Reply to Plaintiff's Response to Defendant Barela's Motion to Dismiss, and at the evidentiary hearing.

Although the Operations Manual states that "[m]ail received without the sender's full name and return address will be rejected," it does not list a reason why.  *Doc. 83* at Exh. F.  In the Reply to Plaintiff's Response to Defendant Barela's Motion to Dismiss, however, Defendant Barela explains that the policy is "necessary to monitor contraband being brought into the facility."  *Doc. 79* at 4.  The manual does not state that the full name

21

and return address need be present *on the envelope* as opposed to interior portions of the correspondence, but that appears to be how DACDC enforces the regulation. *See doc. 84* at 53; *doc. 126* (Defendant Barela explains that the return address must be on the envelope). The parties disagree as to whether mail without a return address is still opened and processed or simply logged and disregarded. *Doc. 126.* Nonetheless, the letter at issue was clearly opened and inspected, as the return address inside the envelope was identified and used to return the item to sender.[10]   At the hearing, Defendant Barela explained that a return address allowed prison personnel to identify a culprit when contraband is mailed into the detention center. *Id.* He conceded, however, that contraband mailers could just provide a false return address, and, in fact, such has happened at DACDC in the past. *Id.*

Although I find the policy of banning all mail without a return address on the envelope to be neutral, it is not rationally related to a legitimate penological interest. DACDC's goal of identifying the senders of contraband is understandable and legitimate, but the policy of rejecting all mail that lacks a return address is too tangential to the goal to meet the first element of the *Turner* analysis.  As conceded by Mr. Barela, contraband senders can simply provide a fictitious address when mailing their illicit wares. Moreover, many legitimate items, such as the letter at issue in the case at bar, are rejected

---

[10] While Plaintiff claims in his Response to the Motion to Dismiss that  his letter from the professor, Anne Fadiman, was destroyed, the Mail Rejection Notice appears to indicate that the letter was, in fact, returned to the address for Ms. Fadiman provided on her letter. *Doc. 84* at 53.

due to this policy.  Thus, the policy is both over- and under-inclusive and it does not meet the rational relation test.

Because the first "factor" is essentially an element, my analysis could end here. *See Boles*, 486 F.3d at 1181.  For the sake of thoroughness, however, I will provide a full *Turner* analysis.  Although an alternative for Plaintiff exists – he could just inform all mail-senders to provide a return address on their envelopes – the third and fourth factors weigh heavily in favor of Plaintiff because DACDC could simply process mail with a return address the same as other mailed items.  Indeed, it appears the letter at issue *was* processed the same despite the lack of a return address.  Thus, allowing letters in despite a missing return address would protect inmates' First Amendment rights at little to no additional cost to the center.

Therefore, I find that *Turner* dictates rejecting the prohibition on mailed items without a return address, and I recommend granting summary judgment in favor of Plaintiff and denying it for Defendants on DACDC's prohibition on mailed items without return addresses.  Defendant Trujillo is a proper defendant for this claim as she was the mailroom staffer who denied Plaintiff's letter.  *Doc. 84* at 53.

E.  Perfumed Items

Next, Plaintiff asserts that his First Amendment rights were violated when he had one letter returned to sender for running afoul of DACDC's "no perfume" regulation. *Doc. 1* at 3.  Indeed, the Mail Rejection Notices provided in the *Martinez* Report reflect that

a letter to Plaintiff was returned to sender for the stated reason of "perfume on letter."

*Doc. 84* at 1.

The Operations Manual states that "[e]nvelopes soaked with cologne or perfume" will be rejected.  *Doc. 83* at Exh. F.  It does not explain what penological interest requires rejection.  Defendant Barela explained in his Reply to the Response to his Motion to Dismiss, however:

> Plaintiff White also argues that the Doña Ana County Detention Center policies restricting the receipt of internet copies of web sites, envelopes with additional writing, envelopes with perfume or envelopes received without the senders' full name and address were unconstitutional. (Document No. 73, pg. 2-4) These policies, however, are necessary to monitor contraband being brought into the facility.

*Doc. 79* at 4.

Mr. Barela elaborated on the penological interest of "monitor[ing] contraband" at the hearing, where he explained that perfume has been used to smuggle drugs into prisons by masking their scent.  *Doc. 126.*  He also offered an additional penological interest: preventing fights among inmates over ownership of perfumed letters.  *Id.*  He explained that, because the ban on perfumed items was in place when he became the warden at DACDC, he had not witnessed fights among inmates over perfumed mail there, but he had witnessed it at other facilities.  *Id.*  Plaintiff insisted that the ban on perfumed items was arbitrary and offered no alternatives.  *Id.*

I find that DACDC's prohibition on perfumed letters is rationally related to its

24

goals of preventing drug smuggling into the center and protecting against inmate fights.  With respect to *Turner*'s second factor, an easy alternative exists for Plaintiff – ask those sending him correspondence not to douse letters in perfume.  To the extent Plaintiff has any constitutional right to receive the perfumed paper itself, the right is weak, and, in this case, its infringement is more than outweighed by the penological interests in keeping inmates sober and reducing the opportunity for conflict.  *See Leachman v. Thomas*, 2000 WL 1239126, at *4 n.4 (5th Cir. 2000)("Leachman insists that the Jail's ban on perfumed letters is similarly void under this analysis. We disagree. Sheriff Thomas demonstrated that perfumed letters pose a drug trafficking risk by masking smells and can lead to inmate unrest as prisoners may fight over such desirable items. Leachman does not demonstrate a valid personal liberty interest in receiving perfumed letters that would outweigh these penological interests. Thus, we conclude that the ban on perfumed letters is a legitimate exercise of the Jail's authority under *Thornburgh*").  Plaintiff proposed no alternative, so factors three and four weigh in favor of Defendants as well.

Therefore, I find that *Turner* dictates that the First Amendment is not violated by the prohibition on mailed items with perfume, and I recommend granting summary judgment in favor of Defendants and denying it for Plaintiff on DACDC's prohibition on mailed items doused with perfume.

F.  Copies

Next, Plaintiff asserts that his rights were violated when several mailed items

were returned to sender for containing "copies."  *Doc. 1* at 3.5.  The Mail Rejection

Notices provided in the *Martinez* Report bear out Mr. White's claim: 17 parcels or

letters were rejected, at least in part, due to their inclusion of  "copies."  *See Doc. 84* at 3-

4, 19, 34, 39, 44, 48-52, 54-59.

Nothing in the Operations Manual prohibits all "copies," though the manual

does prohibit "Internet copies of web sites."  *Doc. 83* at Exh. F.  The manual provides

no penological interest that necessitates the ban.  Exhibit 2 to Defendant Barela's

Motion to Dismiss, however, shows a copy of the "Dona Ana County Detention Center

Mail Guidelines."  *Doc. 61* at Exh. 2.  "Xerox copies, Polaroid/inkjet/laser-printer

photographs" are included on the list of "items that are not authorized."  *See id.* at item

"D."  Given these Guidelines and the mail rejection notices, it appears that the DACDC

mailroom was rejecting mail which included "copies" whether or not the content was

from a website.[11]

Defendant Barela explained in his Reply to the Response to his Motion to

Dismiss that "restricting the receipt of *internet copies of websites*. . . [is] necessary to

monitor contraband being brought into the facility."  *Doc. 79* at 4.  He does not address

---

[11]    As a preliminary matter, the Court notes that unwritten policies are analyzed under the same rubric as written regulations.  *Jones* 503 F.3d at n.13.

26

DACDC's broader policy of rejecting "copies."  At the hearing, Defendant Barela

offered more reasons for rejecting "copies."  Primarily, he argued that copies are

rejected due to inmates using them to make tattoos.  *Doc. 126.*  He explained that some

copies include pictures or symbols that can be used as outlines for tattoos that indicate

gang or position affiliation, and the tattoos are dangerous because they incites fight

and mark people for attack.  *Id.*  He also noted that "copies" are rejected due to clutter

concerns and their ability to mask drugs.  *Id.*  He explained that black heroine has been

smeared on dark copies, and while on at least one occasion the mailroom staffers

caught the contraband, he fears other times dark copies have successfully masked

black heroine and allowed drugs to be smuggled into the jail.  *Id.*

Plaintiff argued that the ban was arbitrary, but allowed that perhaps copies of

known gang symbols could be excluded.  *Id.*  He argued that a drug smear on a piece

of copied paper would be easy to detect and therefore DACDC's drug smuggling

concern was misplaced.  *Id.*

I am unable to find a logical connection between Defendants' stated goal of

"monitoring contraband" and either a policy of rejecting "Internet copies of web sites"

or a broader policy of rejecting mail that contains "copies."  Defendants' stated

penological interest in rejecting letters with "internet copies of web sites," *doc. 79* at 4,

is to "monitor contraband."  *Id.*  Web sites exist for every conceivable topic, only some

which would be incompatible with penological interests.  The connection between the

valid policy of monitoring contraband and prohibiting all letters enclosing copies of web sites is, thus, "so remote as to render the regulation arbitrary or irrational." *Jones*, 503 F. 3d at 1153.

Moreover, a review of the Mail Rejection Notices demonstrates that the rejection category of "copies" includes more than just "internet copies of web sites," and, indeed, likely includes more than xerox copies. Several rejected items were sent from MIM Distributors, a political organization that publishes, prints, and mails newsletters to prisoners. *See doc. 84* at 3, 34, 39, 44, 48-51; *see also doc. 83* at Exh. C (MIM correspondent expressly denied that its rejected mail was a "copy"). Four letters that included materials for an Esperanto course were likewise refused on the basis of "copies."[12] *See doc. 84* at 19, 54, 55, 59. Two letters were rejected due to "Copies (money order receipt)." *Id*. at 55, 57. One letter was rejected due to its inclusion of "inkjet/ laser photo print copies." *Id*. at 4. Also, a letter from Liberty University was rejected because of "Copy (verification form)," *id*. at 58, and a brochure from a university was rejected due to "Copy of College Program and staples." *Id*. at 56; *see also doc. 110*. It seems exceedingly unlikely that all of these "copies" were print-offs of web sites. Indeed, some seem unlikely even to have been xeroxed.

-----

[12] It appears that mailroom staff sought Lt. Porter's approval for acceptance of these letters, and on at least two occasions he refused. *Doc. 84* at 54-55. The Chaplain was consulted once and may have allowed one of the lessons. *Id*. at 59. It is not clear what exceptions, if any, DACDC has to their "no copies" policy.

Defendant Barela's stated interest in monitoring contraband is even less logically tied to DACDC's policy of rejecting mail with any type of copies than it is to a policy of rejecting only internet copies.  Not only would it be nearly impossible for staff to accurately distinguish all copies from truly original documents (people can make hand-written copies, after all), but it is just not clear how material that has been duplicated interferes with "monitoring contraband" any more than material that has not.

The penological interests offered by Defendant Barela at the October 26, 2010 hearing are also too tangential to a blanket ban on "copies" to be rationally related. First, only a small portion of those items that could fall into the category of "copies" are likely to have traceable tattoo material.  Gang symbols could easily be sorted and rejected without denying the entire universe of "copies."  Besides, preventing "copies" from being mailed to inmates is not going to prevent homemade, gang-related tattooing.[13]  Defendant Barela's clutter concerns are not valid, as discussed in earlier sections, because DACDC already has storage restrictions for inmates, and receiving mail, not amassing it, implicates a constitutional right.  Finally, a blanket prohibition

---

[13]Moreover, Defendant Barela noted that the prevention of tattoos was a valid interest because it marked inmates' affiliations, and that posed a threat to the tattooed inmate and could incite violence.  *Doc. 126*.  Defendant Barela, however, conceded that other inmates typically know a new inmate's affiliations as soon as he arrives, so it seems unlikely a new tattoo would connote novel information.

on "copies" is an overly broad response to Defendant Barela's drug smuggling worries. If black heroine smuggling is a real concern and copies with dense areas of toner are especially good at masking the drug, DACDC could prohibit xerox copies with large blackened sections.

Because the first "factor" is essentially an element, my analysis could end here. *See Boles*, 486 F.3d at 1181. For the sake of thoroughness, however, I will provide a full *Turner* analysis. Given the sheer breadth of mailed material which may be "copied," it is not feasible to come up with a meaningful alternative source for all such information. Moreover, Plaintiff has proposed a ready alternative that would address the legitimate penological interest while protecting the First Amendment rights of inmates at minimal cost to the detention center – reject those mailed items that contain copies of gang symbols or large blackened sections. *Doc. 126*. Thus, all of the *Turner* factors swing heavily in favor of the Plaintiff.

I find that *Turner* dictates rejecting the prohibition on mailed items that include "copies" even if just limited to copies of websites, and I recommend granting summary judgment in favor of Plaintiff and denying it for Defendants on DACDC's prohibition on mailed items that include "copies." Defendant Trujillo is a proper defendant for this claim as she was the initial mailroom staffer to deny Plaintiff's mail on the basis of its inclusion of "copies." *See Doc. 84* at 3-4, 19, 34, 39, 44, 48-52, 54-59.

*2.  Treatment while in Administrative Segregation*

Plaintiff claims that he also had mail rejected on September 16, 2008 because it contained photographs and photos are not allowed to inmates in the "hole." *Doc. 1* at 3.5.  He further claims he was not in segregation on that day.  *Id*.  Relatedly, his complaint includes the general allegation: "while an inmate is placed in "Supermax" or the "hole" he is not allowed to have paper or pen in his cell and is given no access to his legal materials what-so-ever." *Id*. at 4.2.  Defendants do not address these claims, however, they include in their *Martinez* Report the Mail Rejection Notice that pertains to the letter and photographs to which Plaintiff refers. *Doc. 84* at 30.

That Mail Rejection Notice includes the following description: "Photos not allowed in max pod.  Total of 5 photo placed in [9/15/08] your property can pick up when out of max pod.  Will give detainee letter (9/16/08)," *id*.  In the "Description of Other" the Mail Officer also wrote "in box now." *Id*.  It appears from this notice that, regardless of where Plaintiff was housed when DACDC received these photos, the photographs made it to him the next day.  A single delay of ordinary mail does not rise to the level of a constitutional violation.  "[I]solated incidents of mail delay do not violate the Constitution." *Bruscino v. Pugh*, 2006 WL 980580 at *7 (D.Colo. 2006)(citing *Zimmerman v. Tribble*, 226 F.3d 568, 572-73 (7th Cir. 2000)).

Further, Plaintiff's assertion that, "while an inmate is placed in 'Supermax' or the 'hole' he is not allowed to have paper or pen in his cell and is given no access to his

31

legal materials what-so-ever," does not state a claim.  *Doc. 1* at 4.2.  Plaintiff does not claim that *he* was denied paper, pen or legal materials because he was in the "hole." Even if he had, he failed to give any factual evidence to support his claim, such as dates of his segregation, dates on which paper, pen, and legal materials were requested and denied, or to which "legal materials" he refers.

Thus, I recommend granting summary judgment in favor of Defendants and denying it for Plaintiff on Plaintiff's allegations of mail-mishandling while he was in administrative segregation.

3. *Free Exercise and RLUIPA:*

In his Complaint, Plaintiff lists as one of his counts, "1st amendment violation of freedom of religion and access to religious materials."  *Doc. 1* at 3.   He adds no further explanation of his claim.  In his Response to the *Martinez* Report, however, he fleshes out his claim by stating: "[certain of the mail rejections] also violated the Plaintiff's right of the First Amendment to have access to religious materials by denying him the publication the *Christian Science Monitor* and copies of verification forms from Liberty University's Home Bible Correspondence Program."  *Doc. 95* at 1.

In his Response to Defendant Barela's Motion to Dismiss, he also asserts that his rights under RLUIPA[14] were violated when he was denied his subscription to the

---

[14]  The Court does not have to address Plaintiff's RLUIPA claim because it was not brought in his Complaint.  Nevertheless, Defendants have not objected, Defendant Barela

*Christian Science Monitor* and mailed verification forms for enrollment into Liberty

University for a Bible study course.  *Doc. 73* at 6.  Defendant Barela responded to

Plaintiff's claim in his Reply, noting that DACDC's policy is to refuse religious items

unless approved by the Chaplain.  *Doc. 79* at 5.  He clarified further: "there is no

evidence that Plaintiff White attempted to get approval from the Chaplain to approve

receipt of these materials.  The policy does not ban all religious material, it only

regulates such material because it could be controversial and create conflict within the

facility."  *Id.*  Defendants state in the *Martinez* Report, however, that "The DACDC

returns all incoming religious books and publications to the sender."  *Doc. 83* at 6.

Despite this inconsistency, I recommend granting summary judgment in favor of

Defendants for the reasons given below.

Plaintiff has conflated two legal theories under which prisoners are entitled to

certain religious protections.  "The standards under RLUIPA are different from those

under the Free Exercise Clause."  *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1314 (10th Cir.

2010)(citing *Kay v. Bemis*, 500 F.3d 1214, 1221 (10th Cir. 2007)).  I will address his claim

_____

responded to the claim, and the new legal theory arises from the same facts pled in the
Complaint and it is not inconsistent with his pled legal theories.  *See Hayes v. Whitman*, 264
F.3d 1017, 1025 (10th Cir. 2001)("it might be appropriate for a court to consider additional
facts or legal theories asserted in a response brief to a motion to dismiss if they were
consistent with the facts and theories advanced in the complaint."); *see also Carson v. Cudd
Pressure Control, Inc.*, 299 F. App'x 845, 848 (10th Cir. 2008).  Thus, I recommend addressing
the claim.

under both.

Plaintiff has not pled enough to state a First Amendment free exercise violation.

The test for a free exercise claim in the Tenth Circuit is as follows:

> [I]n order to allege a constitutional violation based on a free exercise
> claim, a prisoner-plaintiff must survive a two-step inquiry. First, the
> prisoner-plaintiff must first show that a prison regulation "substantially
> burdened ... sincerely-held religious beliefs." Consequently, "[t]he first
> questions in any free exercise claim are whether the plaintiff's beliefs are
> religious in nature, and whether those religious beliefs are sincerely
> held." Second, prison officials-defendants may "identif[y] the legitimate
> penological interests that justif[ied] the impinging conduct." At that
> point, courts balance the factors set forth in *Turner*. . . to determine the
> reasonableness of the regulation.

*Kay v. Bemis*, 500 F.3d 1214, 1218 -1219 (10th Cir. 2007)(internal citations omitted). The

first step is a threshold issue that must be met by the Plaintiff. *See e.g. Gladson v. Iowa*

*Dept. of Corrections*, 551 F.3d 825 (8th Cir. 2009). Plaintiff has pled no facts whatsoever

as to what his beliefs are or how the rejection of the mail at issue substantially

burdened his religious practice. At the hearing, Plaintiff stated he is not a Christian

Scientist, though he is a Christian. *Doc. 126*. He also stated that he felt the *Christian*

*Science Monitor* is a religious publication because although it covers secular stories, it

does so with a Christian viewpoint. *Id.* In a similar case involving a prisoner's lack of

access to a desired religious magazine, one district court held:

> Plaintiff has completely failed to present any evidence that lack of the
> magazine is infringing on his free exercise of religion. Plaintiff has not
> alleged that the teachings of his religion require the use or reading of the
> magazine; he has not alleged that there were not alternative means

34

through which he can practice his faith without the magazine.

*Cook v. Long*, 2009 WL 1578924, 5 (E.D.Mo. 2009).  Similarly, Plaintiff here has failed to allege, let alone present any evidence, demonstrating that the denial of his newspaper or verification papers for his home bible study course substantially burdened his sincerely-held religious beliefs.  Moreover, at least with reference to the *Christian Science Monitor*, it seems Plaintiff may be hard-pressed to demonstrate how access was necessary for the exercise of his religion when the newspaper expressly denies its religious identity.  *See* "About the Christian Science Monitor" available at http://www.csmonitor.com/About/The-Monitor-difference,("FAQ: Is the Monitor a religious publication?  No, it's a real news organization owned by a church. . . . Everything in the Monitor is international and US news and features, except for one religious article in the weekly magazine and Daily News Briefing.")  Thus, I find he has not met his burden and recommend summary judgment for Defendants on this claim.

Plaintiff, likewise, has not met his burden under RLUIPA.  The Tenth Circuit recently explained the RLUIPA standard as follows:

> In relevant part, RLUIPA provides that: No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution. . . . [T]o proceed with his RLUIPA claim, Mr. Abdulhaseeb must demonstrate he wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government.

*Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312 (10th Cir. 2010)(some citations omitted).

"[RLUIPA] defines 'religious exercise' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Id.* at 1314 (quoting *Kay*, 500 F.3d at 1221).  But,

> While recognizing that RLUIPA's protection extends beyond practices that are central to a religion, we do not intend to imply that every infringement on a religious exercise will constitute a substantial burden. "The practice burdened need not be central to the adherent's belief system, but the adherent must have an honest belief that the practice is important to his free exercise of religion." *Sossamon*, 560 F.3d at 332; *see also Smith*, 502 F.3d at 1278 ("[A]t a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious item or observance was more than an inconvenience to one's religious practice.").

*Abdulhaseeb*, 600 F.3d at 1316.  Thus, the first step of a RLUIPA claim is similar to that of a free exercise claim, and Plaintiff bears the burden of demonstrating that the denial of his *Christian Science Monitor* subscription and the verification forms for his bible home study course with Liberty University substantially burdened, rather than merely inconvenienced, his religious practice.

The *Abdulhaseeb* court determined that religious exercise is "substantially burdened" when:

> a government (1) requires participation in an activity prohibited by a sincerely held religious belief, or (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent either not to engage in conduct motivated by a sincerely held religious belief or to engage in conduct contrary to a sincerely held religious belief. . .

*Abdulhaseeb*, 600 F.3d at 1315.  As explained above, Plaintiff has provided the Court

36

with no claims as to what his religious beliefs are or how the denial of these mailed items interfered with his religious practice.  Thus, he has not demonstrated that his practice of religion was even inconvenienced, let alone substantially burdened, by DACDC's mail regulation.  Therefore, I recommend summary judgment for Defendants on Plaintiff's RLUIPA claim.

*4.  Access to the Courts*

A.  Access to a Law Library and Mailed Legal Materials:

Plaintiff argues that his right to access the courts was violated by the prison's failure to maintain a legal library and practice of rejecting legal materials[15] sent through the mail.  *Doc. 1* at 4; *see also Doc. 73* at 5, *Doc. 80* at 4, *Doc. 95* at 2.  "[T]he fundamental constitutional right of access to the courts requires prison authorities to ... provid[e] prisoners with adequate law libraries or adequate assistance from persons trained in the law."  *Peoples v. CCA Detention Centers*, 422 F.3d 1090, 1107 (10th Cir. 2005)(quoting *Bounds v. Smith*, 430 U.S. 817, 828,(1977)).  The Supreme Court has made clear, however, that the Sixth Amendment does "not create an abstract free-standing right to a law library or legal assistance," and general allegations of the inadequacy of a prison legal library are thus insufficient to state a claim that a plaintiff has been denied access

---

[15] Plaintiff specifically takes issue with the rejection of a letter from The Lewisburg Prison Project (*doc. 95* at 2), the book "The Jailhouse Lawyer" and legal materials and information from Jay Summers, Legal Assistant for MIM Distributors.  *See doc. 73* at 5 and *doc. 80* at 4.

to the courts. *Lewis v. Casey*, 518 U.S. 343, 350-51 (1996). Indeed, in order to maintain a valid denial of access to the courts claim, a Plaintiff is required to "'demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.* at 351. The *Lewis* Court went on to offer what sorts of allegations might constitute harm:

> He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

*Id.* Finally, although most of the case law on this issue involves state or federal prisoners, the Tenth Circuit has applied the same analysis to detainees. *See e.g. Peoples v. CCA Detention Centers*, 422 F.3d 1090, 1107 (10th Cir. 2005).

The Tenth Circuit has repeatedly recognized the requirement that plaintiffs allege harm when bringing an access to the courts claim. *See e.g. Muhammad v. Collins*, 241 F. App'x 498, 500 (10th Cir. 2007); *Fogle v. Pierson*, 435 F.3d 1252, 1264 (10th Cir. 2006); *Ferguson v. New Mexico Corrections Dept.*, 38 F. App'x 561, 563 (10th Cir. 2002); *Purkey v. Green*, 28 F. App'x 736, 741-42 (10th Cir. 2001). Indeed, even where the alleged conduct of the prison officials is egregious and may have delayed a prisoner's filings, the Tenth Circuit has held that the conduct did not meet the *Lewis* standard:

> Plaintiff alleges that defendants unconstitutionally denied him access to the courts by, among other things, tearing up the initial copy of his

38

> complaint and the supporting exhibits, refusing to provide him with tape
> to mend the torn items, refusing to photocopy legal documents, refusing
> to allow him to purchase large manila envelopes for mailing his
> complaints to the courts, and delaying or denying him access to legal
> research materials. . . Applying *Lewis* to the facts alleged by plaintiff, we
> agree with the district court that plaintiff failed to state a claim for denial
> of access to the courts. It is apparent that, notwithstanding the
> defendants' alleged misconduct, plaintiff was able to pursue his civil
> rights claims by filing three separate complaints in district court and an
> appellate brief in this court. At worst, defendants' misconduct
> temporarily, but not fatally, delayed, and did not unreasonably hinder,
> the filing of those claims.

*Purkey v. Green*, 28 F. App'x 736, 741-42 (10th Cir. 2001).

Similarly, assuming *arguendo* that Mr. White's rejected mail constitutes "legal mail," a plaintiff alleging the denial of his constitutional rights based on a prison's rejection of his legal mail "must allege intentional conduct interfering with that mail and 'actual injury by frustrating, impeding, or hindering his efforts to pursue a legal claim.'" *Lopez v. U.S. Sentencing Commision* [sic], 266 F. App'x 759, 761-762 (10th Cir. 2008)(quoting *Simkins v. Bruce*, 406 F.3d 1239, 1243 (10th Cir.2005).

Here, Plaintiff has alleged that DACDC does not have a law library or legal aide available to inmates, and it does not allow him to receive legal materials through the mail. *Doc. 1* at 4; *Doc. 73* at 5; *Doc. 80* at 4; *Doc. 95* at 2. He does not allege, however, that he was harmed by those circumstances save to say that he was unable to "file in a more timely manner and a more consice [sic] complaint." *Doc. 95* at 2. As shown in *Purkey*, an allegation of delay, without more, does not constitute harm. *See Purkey*, 28

F. App'x at 741-42.  Additionally, Plaintiff has proposed no detriment he has suffered

due to the alleged diffuse nature of his Complaint.  Moreover, a review of the docket

sheet for this case indicates that Plaintiff has had plentiful access to the courts: he has

filed more than twenty-five motions, and some with success.  Any inconvenience the

lack of a law library and certain mailed items may have caused Plaintiff clearly has

been overcome.  I find no violation and recommend that summary judgment for

Defendants be granted on this claim.

### B.  Opening of "Legal Mail"

Plaintiff also claims that certain mail should have been opened in front of him

but was not.  Specifically, he claims packages sent to him from The Center for

Constitutional Rights and the New Mexico Supreme Court ("requesting case law")

contained "legal mail" and, as such, he had a right to be present when the packages

were opened and searched for contraband.  *See doc. 1* at 4.1-4.2.  He further asserts that

the unsupervised openings demonstrate that Defendants sought "to hinder [Plaintiff's]

filing of any kind of action against DACDC in court."  *Id.* at 4.2.  Defendants argue that

none of mail at issue constituted "legal mail," and, even if it did, its opening and

inspection away from the presence of the Plaintiff did not constitute a constitutional

violation.  *Doc. 83* at 8-9.

The Tenth Circuit has not provided much guidance on the issue of what

constitutes legal mail or what standard courts should use when a prisoner alleges his

rights were violated because such mail was opened without his presence.  One unpublished Tenth Circuit opinion upheld dismissal of a claim that prison officials opened one item of allegedly legal mail not in the presence of the prisoner.  *See Berger v. White*, 12 F. App'x 768 (10th Cir. 2001).  The court held that "isolated incidents of opening constitutionally protected legal mail, 'without any evidence of improper motive or resulting interference with [plaintiff's] right to counsel or to access to the courts,' do not support a civil rights claim."  *Id.* at 771(quoting *Smith v. Maschner*, 899 F.2d 940, 944 (10th Cir. 1990)(where defendants admitted the item in dispute constituted "legal mail" and plaintiff may or may not have been present when it was opened).  Another unpublished case involving an isolated incident of legal mail being inspected without the prisoner's presence held that plaintiffs must "show either an improper motivation by defendants or denial of access to the courts."  *Florence v. Booker*, 23 F. App'x 970, 972 (10th Cir. 2001).

Letters from a Plaintiff's attorney of record are "legal mail," and some courts extend that category to letters from courts and prosecutors as well.  *See e.g. Sallier v. Brooks*, 343 F.3d 868, 876- 877 (6th Cir. 2003).  Correspondence with an attorney Plaintiff is actively seeking to retain might also qualify, *Jenkins v. Huntley*  235 F. App'x 374, 376 (7th Cir. 2007)(citing *Kaufman v. McCaughtry*, 419 F.3d 678, 686 (7th Cir. 2005).  At least one Court of Appeals has held that certain mail from nonprofit civil liberties organization and other legally oriented entities is not "legal mail."  *Kaufman v.*

41

*McCaughtry*, 419 F.3d 678, 685-686 (7th Cir. 2005); *see also Sallier v. Brooks*, 343 F.3d 868, 875 (6th Cir. 2003)(holding that an envelope from and organization such as the American Bar Association need not be treated as "legal mail").

DACDC's regulations appear to be in line with the relevant jurisprudence.  In its Operations Manual, DACDC defines "legal mail" as "privileged, confidential correspondence from the detainee's attorney of record."  *Doc. 83* at Exh F.  It further provides that "[l]egal mail will be opened and inspected for contraband in the presence of the detainee," and  "[c]opies of legal material from a law library are not considered privileged information."  *Id*.

I conclude that neither the requested case law from the New Mexico Supreme Court nor the copy of "The Jailhouse Lawyers Handbook" from The Center for Constitutional Rights constitutes "legal mail" that must be opened in Plaintiff's presence.  Even if it were legal mail, Plaintiff has put forward no evidence of improper motive; his bare assertion that the unsupervised openings demonstrate that Defendants sought "to hinder [Plaintiff's] filing of any kind of action against DACDC in court," is a conclusion without supporting factual allegation.  Plaintiff has also failed to allege how the unsupervised opening interfered with his right to access to court.  As explained in the previous section, Plaintiff must allege harm when bringing an access to the courts claim, and he has not alleged how the opening of these two items without his supervision impeded his access to the Courts.  Thus, I recommend summary

judgment for Defendants on this claim.

*5. Additional Claims*

     In addition to Plaintiff's Fourteenth Amendment due process access to the

courts claims,[16] Plaintiff's Complaint includes the allegation that his "14th amendment

right of the equal in the process," was violated.  *See Doc. 1* at 3.  Plaintiff does not

present any basis for such a claim as he did not assert that any violations were due to

his status as a member of any particular group.  To the extent Plaintiff brings an equal

protection claim, I thus recommend dismissing it due to his apparent abandonment of

the issue and failure to state a claim.

     Plaintiff also complains that DACDC refused to give him copies of his trust

account so that he could file under the *in forma pauperis* statute, 28 U.S.C.A. § 1915.

*Doc. 1* at 3.5.  A copy of Plaintiff's trust account was attached to Plaintiff's second

motion to proceed IFP (*doc. 4*), which was granted within a month of the filing of

Plaintiff's complaint (*doc. 5*).  I therefore recommend that any claim Plaintiff asserts

against the Defendants for their failure to provide the trust documents be denied as

moot.

     Finally, there are a few mailroom policies that Plaintiff asserts are arbitrary, yet

---

[16] At times, Plaintiff mistakenly asserts that his state due process claims stem from the Fifth rather than the Fourteenth Amendment.  *See e.g. Doc*. 1 at 3.  I have construed his Complaint liberally and analyzed his due process claims under the Fourteenth Amendment.

he does not allege (and the evidence does not suggest) any of his mail was rejected due to those particular provisions.  *Doc. 1 at 3.5.*  Specifically, in addition to the mailroom prohibitions already discussed, Plaintiff complains that the policy of rejecting all postcards, as well as the policy of rejecting all envelopes with extraneous writing (such as "SWAK") or make-up marks, is arbitrary.  *Id.*  Plaintiff cannot assert a claim for which he has no injury.  See *Southern Utah Wilderness Alliance v. Office of Surface Mining Reclamation and Enforcement,*  620 F.3d 1227, 1233 (10th Cir. 2010)("To show that he has Article III standing, a plaintiff must demonstrate three elements: injury in fact, traceability, and redressability.  To demonstrate an injury in fact, a plaintiff must show he has suffered an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.")(internal citations omitted).  Thus, to the extent Plaintiff attempts to seek redress for those mailroom policies, I recommend denying his claims due to lack of standing.

<u>**CONCLUSION**</u>

 **I THEREFORE RECOMMEND** that summary judgment should be granted for Plaintiff on his claims against Defendants for rejected mail due to DACDC's prohibition on mailed newspapers, magazines, books, newsletters, "copies," and envelopes with no return address.

 **I FURTHER RECOMMEND** that Defendants' *Martinez* Report (*Docs. 83, 84*) be treated as a motion for summary judgment, supported, where relevant, with the

arguments in Defendant Barela's "Motion to Dismiss, or in the Alternative, for Summary Judgment" (*Doc. 61*) , and be granted for all other claims.

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1)(c). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____

UNITED STATES MAGISTRATE JUDGE